of the case of Robert M. Glenn versus American Airlines. We'll hear first from Mr. Bono. Yes, Your Honor. Good morning, Your Honors, and may it please the court. My name is Craig Bono, and I represent Robert Glenn, who is the appellant here and is the plaintiff below. The district court in this case dismissed Mr. Glenn's claims for three independent reasons, each of which was an error. I plan to address each of those reasons today. First, the district court dismissed Mr. Glenn's claims based on Article III standing. The district court here is the only court in the country who have held that a plaintiff in a Helms-Burton case does not have Article III standing. And in fact, since this district court made that ruling, the courts that have addressed it have rejected the district court's reasoning. And in particular, in the District of Delaware, where Mr. Glenn is the plaintiff in the case against very similarly situated defendants, with similar, almost virtually identical, really, allegations related to standing, the district court in Delaware explicitly rejected the district court's reasoning here and held that Mr. Glenn has standing in the Helms-Burton suit there. The district court here held that Mr. Glenn could not establish an injury in fact, and thus didn't have Article III standing. To get there, the court held there was no concrete injury because the congressionally elevated harm, and as the court is aware, there are two methods to establish a concrete injury in the intangible harm world. One of them is a congressionally elevated harm. The other is a traditional harm that's been recognized by American courts. The district court only did the analysis on the congressionally elevated harm method and found that there was no congressionally elevated harm. That is the method by which the District Court of Delaware went the opposite direction, as has every other court that's done the analysis on Helms-Burton. I encourage the court to rely on the District Courts of Delaware reasoning as a much more thoroughly thought through reasoning. And because I only have 15 minutes and I have three issues, I wanna skip to the traditional harm method because I think that the congressionally elevated harm method has been discussed. I only wanna mention that the TransUnion case that came out recently from the Supreme Court does discuss the congressionally elevated harm issue and appears to narrow it in some ways, but explicitly makes the point that the reason that it's making that narrowing, at least if not primarily, certainly substantially, is there's a separation of powers concern associated with that method of elevating a harm to a concrete injury. But here under the Helms-Burton Act, we don't have that concern because the executive branch has the power to suspend private rights of action, which it is used and did use for 23 years, and also has the power to lift that suspension, which it is now used. And so to the extent that a separation of powers issue is the real issue that TransUnion is relying on to narrow the congressionally elevated harm, that isn't an issue here because Helms-Burton incorporated a separations of powers element by giving the executive branch the power to suspend the claims. Let's say you're right on standing, that's arguendo, when did your client take ownership of the properties? Thank you, Your Honor. So our client inherited the claims to the properties from his aunt and his mother, and that occurred after 1996, which I believe is what Your Honor is getting at. So the- Are you gonna win the battle but lose the war, I guess is what I'm asking. I don't think so, Your Honor. I hope to win both all the battles and the war. So as this court, so I'll skip ahead then, as this court expressed in U.S. versus K, whenever you have, for statutory interpretation, the court starts with, quote, the starting point for interpreting a statute is the language of the statute itself. Terms not defined in the statute are interpreted according to their ordinary and natural meaning, as well as the overall policies and objectives of the statute. So it's undisputed that the word, and the word that is at issue here in 22 U.S.C. 6082-4A, or sorry, 4B, is the word acquire, right? Does the word acquire mean inheritance or does the word acquire mean something else? Mr. Glenn argues that the definition of acquire as it's used here should mean active conduct. So some form of active conduct on behalf of the U.S. national that gets the claim. The defendant or the American Airlines and the district court view it as a broader definition. That would mean anything that gets you the claim. That could be a passive inheritance, that could be an accident, that could be an active going out and buying the claim or seeking an assignment of the claim. It's a very broad definition that they assert. Both of those definitions are used in common parlance. People use the word acquire to mean actively going and doing something. People also undoubtedly use the word acquire to mean passively doing something in addition to actively doing something. Both definitions are feasible. So the court then needs to look to the policies and objectives of the actual statute that we're talking about to determine which of these both reasonable definitions is the right definition for these circumstances. And that's what happened in K. In U.S. versus K, the term at issue was the term business and the U.S. government wanted a broad definition of business because it expanded the criminality of the conducted issue and the defendants in that suit wanted business to be a narrow term. And so the court said, well, both of those are reasonable. So we got to look further than just the words themselves. In that case, the court had to go to the legislative history. Here, the court doesn't have to go to the legislative history to determine what the objectives and the policies are for this statute because Congress gave us findings in- Can you explain this passive notion? I'm sorry? Your take is that we should use a passive approach? No, so our take is that- I'm sorry. All right, our take is that acquired means that you have to actively do something to get the claim. So you have to go buy it. You have to go seek an assignment of it. Whenever you acquire something, you are going out and you are doing something to get it. When you inherit a claim, you're not doing anything. It is passing to you. And if you look at the- But don't you have to accept the property? I'm not a trust and estate expert by any stretch of the imagination, but you're not required to take property that is given to you through inheritance. You have to accept it, right? I think you have to not reject it. I think that is right. But not rejecting is a little bit like going out and asking to purchase something. There's certainly a much more passive quality to an inheritance or receiving a gift. That's like, if you receive a gift, do you have to actually receive it to receive it? Sure. You have to grab the gift that is given to you. Earlier in this argument, just a few minutes ago, I asked you, when did your client take ownership? And I think you agreed that your client took ownership after 1996. Why is take and acquire? What's the difference between those two terms? So I wanna, because I think that it's important to view the statute as a whole, I wanna talk about, to answer you, I wanna answer your question, but I wanna do it within the context of the policy of this statute itself. And I think if you look at 62 U.S.C. 6081, which is the congressional findings related to this statute, where Congress made 11 separate findings, and the 11th one, which is sort of the grand finale- Look, I'll grant you that Congress did not have subjectively in mind the inheritance fact pattern. That's not what springs readily to mind. The question is, why does the word acquire take on a different meaning from what it took you to accept that if it was take ownership, we wouldn't be here? So why is acquire any different? So I think the answer is- I think the opposing brief provides a lot of examples in various other statutes where the word acquire contemplates a number of fact patterns, including inheritance. I agree that there are certainly statutes wherein that occurs. So I think the answer, and I'm just gonna make this point, and then you can tell me that I'm wrong on it, and then tell me, and I can try to answer it in a different way. But if you look at point 11, which is the final point of the findings,  to deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States. Victims. I have an eight-year-old and a five-year-old, and if the US government wrongfully confiscates my house this afternoon when we get home, my wife and I aren't the only victims of that confiscation. My eight-year-old and five-year-old are equally victims of the confiscation, despite the fact that they don't currently have a property interest, as in they don't own title to our house. Here, Mr. Glenn was a child when these properties were confiscated, but he was a victim of that confiscation. Undoubtedly, he was a victim of that confiscation. The only reason we're having the conversation we're having is that his mother and his aunt happened to die at the wrong time. If they had died before 1996, we wouldn't be having this conversation. If they had died after they brought these claims in 2019, whenever the suspension was lifted, we wouldn't be having this conversation. The only reason we're having the conversation about what does acquire mean is because they passed away between 1996 and 2019 when this act was suspended. So my position is- I think you make a compelling point in a sense that I think, you know, clever lawyer on your part, the date of the death should, you know, from a moral or justice standpoint, shouldn't affect one's property rights. I understand the theory, but the problem is that's always true when Congress sets deadlines. You're always gonna have, you know, just because something happens one day later, all of a sudden the result's completely different. Isn't that just the nature of all deadlines and statutes and limitations and whatnot? It absolutely is, your honor. The question isn't does the deadline exist? The reason I'm talking about the estate tax and people dying on December 31st versus January 1 could have an enormous impact. That makes no sense, but for the fact that that's how our legal system works. And you have to draw a line somewhere. You know, if you're gonna draw a line, it's gotta be drawn, right? And so I don't disagree with you that there is a deadline and the deadline is it. And I'm not asking you to ignore the fact that March 12th, 1996, there's a deadline in the statute. What I'm asking you to do is what the court, the inquiry the court did in U.S. versus K, which is there are two definitions here, both of which are reasonable. It's reasonable whenever you use the word acquire to mean that you're going out and doing something to get it. What I'm asking the court to do is to use that definition for acquire because it comports with the policies and objectives of the statute. As your honor mentioned, there's nothing in the statute that indicates- What's your best example of Congress or our court using the word acquire in a way that would exclude receipt of property through inheritance? So I think that we have a, we sat in our papers and off the top of my head, I don't have the case memorized, but it is in our papers where there is an IRS statute that the court uses that excludes the term inheritance from the definition of acquired. I believe that's right, but I don't, off the top of my head, I don't have an answer. To your knowledge, there are a lot more statutes on the other side as the red brief outline. I absolutely do, your honor, but the point is that each of those statutes have different policies. The policy here is what should inform the way that this court defines the term acquired. The policy here is to provide victims with a judicial remedy. So although there are many statutes, that isn't the policy, and so therefore acquired can mean the broad definition, which admittedly is a way that the term acquired is used, it absolutely makes sense in many instances. It just doesn't make sense in this instance it goes directly in contravention of the policy and objective of this statute, which is explicitly defined in the statute itself. The last issue that I'll quickly touch upon is that the court in the district court dismissed the claims based upon the knowingly standard and applying the term knowingly to not only the actions of the defendants, the plaintiffs are required to plead that the defendants not only knowingly acted, but that they knew that the property at issue was confiscated over 50 years ago, and that the specific piece of property was confiscated by the Cuban government, and that they were using that piece of property in their business engagements in whatever way they were using it. The court relies on excitement video to make that holding, but excitement video, if the court were to read it closely, counsels the direct opposite way. Excitement video makes it very clear that the decision that it was making is because the decision related to a criminal statute that has a very similar structure to the statute that we have here, context and subject matter is very different, but there the court says that the natural grammatical reading of that statute would be to apply knowingly only to the verbs, but because there are constitutional concerns related to criminal liability, courts, including the Supreme Court and excitement video, will imply, will import knowledge into a variety of the elements that knowledge doesn't actually apply to pursuant to the terms of the statute, so as to solve a constitutional, potential constitutional problem. Here, we don't have that constitutional problem because we don't have a criminal statute, American Airline is subject to criminal liability, and so the court should follow what the Supreme Court said in excitement video, which is the simple and obvious grammatical reading of the statute, which is that knowingly applies to the verbs that it surrounds and not the rest of the statute, because there is no constitutional criminal concerns associated with the Helms-Burton claim. Thank you, Your Honor. Unless you have anything else, I'll rest until my rebuttal. Mr. Miser, Miser. Good morning, Your Honor. May I please the court, Ben Miser for American Airlines. One of two things is true, either the term acquires in the Helms-Burton Act, Section 6082A4B includes inheritance or it does not. If American is right and acquires includes inheritance, then Mr. Glenn acquired his claim too late outside of the statutory deadline, and he therefore lacks statutory standing. But if Mr. Glenn is right and acquires does not include inheritance, then Mr. Glenn never acquired a claim at all, and he has no statutory standing because he has no claim to bring. The statutory text says very plainly, a US national may not bring an action under this section on a claim to confiscated property unless such national acquires ownership to the claim before March 12th, 1996. Mr. Glenn's position is that inquires does not include inheritance. The only way in which he possibly could have gained ownership of this claim is via inheritance, and therefore he never acquired his claim. To use an analogy, if a parent tells her child that the child may not watch television unless the child finishes her homework before 7 p.m., and the child does not finish her homework before 7 p.m., then she may not watch television. And that is, finishing the homework is a prerequisite to watching television. Mr. Glenn's own position here this morning is that he did not finish his homework, but nonetheless, he can watch television because Congress didn't mean for him to have to finish his homework. Congress wanted him to be able to watch television. But the way we know what Congress's intent was is by the words that Congress used, and the statutory text here could not be plainer. Mr. Glenn's counsel has acknowledged this morning that acquires does have the plain meaning of acquisition by inheritance. That plain meaning and that concession suffices to resolve this case. If it's necessary to gild the lily, I think our brief is replete with examples of both Congress, this court, and the Supreme Court using the term acquires to include inheritance. And indeed, I believe that Mr. Bono was referring to the Huddleston case when he was referring to an IRS case. And in that case, the Supreme Court said that acquires includes inheritance. And so there is no case to support Mr. Glenn's position that acquires does not include inheritance. But if there were, then he would have no claim to bring. And to be clear, because this is a statutory standing defect, it is a threshold non-merits ground that this court can reach before it even addresses Article III standing. And this acquisition defect, this statutory standing deficiency, is a sufficient ground on which this court can simply resolve this case and not remand to the district court, but affirm rather the dismissal of this case. And I do think it's- If we jump right into counsel's second issue, do you wanna, I'm not gonna make you, but do you wanna talk about the first issue? I'd be happy to talk about Article III, Your Honor. But if I could say one more thing about statutory standing, which is that every single court agrees with American Airlines' view of what acquisition means in this statute. And indeed the 11th Circuit has rejected the argument that Mr. Glenn is offering here this morning. And so this court, if it were to affirm on this ground, would be joining every other court to have considered the issue. But I'll turn to Article III standing. The statute requires Mr. Glenn to own the claim to the properties. I believe Mr. Glenn's argument appears to be that Congress conferred a cause of action on Mr. Glenn based on his underlying ownership of the properties, but that is simply mistaken. All that Congress did was create a cause of action for trafficking. Congress did not declare who owned the underlying properties. On the contrary, Congress was legislating against a number of background presumptions, including the presumption against extraterritoriality, as well as the presumption against retroactivity. The Supreme Court in the Germany versus Philip case just earlier this year, I believe in January, made abundantly clear that one background principle of the law of property is that takings in a foreign government, by a foreign government, from citizens of that foreign sovereign are not matters of concern to US law or matters of concern to international law. Instead, the domestic takings rule means that domestic takings are purely domestic affairs. Doesn't that kind of defeat the whole purpose of Title III? Absolutely. I think it's Title III. Absolutely not, Your Honor. And in fact, the title of Title III is protection of property rights of US nationals. What Congress was concerned about, and this is reflected both in the text and the purpose of the statute, was takings by the Cuban government from foreign nationals. Congress said in the title of Title III, in the findings of Title III, that it was concerned about trafficking in property, quote, confiscated from US nationals. If the court is inclined to look at legislative history and it need not, the legislative history only confirms this view. The conference report specifically says that Congress was concerned about the United States government's obligation to, quote, protect its citizens against confiscation and the absence of effective remedies in international law. And Congress was therefore creating, quote, a unique but proportionate remedy for US nationals who were targeted by the Castro regime. So Congress in both the text- Is this derivative of your first argument essentially that the property wasn't acquired by US national until after 1996? And so for that reason, we affirm. Yes, Your Honor. I do think that- This is not a freestanding argument on standing other than the date issue. No, respectfully, Your Honor, it is a freestanding argument in the sense that there is no concrete injury here. There's no Article III cognizable injury to Mr. Glenn because neither he nor his ancestors had a constitutionally kind of cognizable protected property interest in the property that forms the basis of the suit. And if Mr. Glenn is correct that Congress meant to create a, what he terms, a statutorily constructed property interest, then that runs headlong into the court's recent decision in TransUnion along with- So look, I take your point that this is not a congressional reassignment of property rights. It's a money damages claim, right? But I guess what I'm trying to figure out is why does that deprive the court of standing in the Article III sense other than your sort of merits argument about the date? To be clear, Your Honor- The idea essentially that this would be Congress and the courts overriding some international legal principle? No, that's not the position, Your Honor. The position rather is that Congress did not intend to protect individuals who were Cuban nationals at the time of the taking. The statute only creates a cause of action, a cognizable cause of action with Article III standing on individuals who were US nationals at the time of the taking. The text only protects individuals who were US nationals at the time of the taking because if the individual was a Cuban national at the time of the taking, then that was a purely domestic taking. And Congress was legislating against the backdrop of the domestic takings rule, which meant that Congress didn't intend to reach purely domestic takings because purely domestic takings are a purely domestic affair. I get the principle that we normally don't construe statutes lightly to override international legal principles, but what about the act of state doctrine provision? Doesn't that make clear that the whole point of this statute is to ignore international law and create these rights? It does, respectfully, Your Honor, it does not. And that is because the court just made clear in January in Germany versus Philip, that the domestic takings rule is a separate principle from the act of state doctrine. The act of state doctrine, which Congress did say in the statute, it didn't tend to apply, is a court-created doctrine that says, in which the Supreme Court in the Sabatino case said, look, we're just gonna stay our hand here because- So tell me a story about how these two concepts can co-exist that you have an express abrogation of the act of state doctrine, yet we still give the domestic takings doctrine force. I'm not sure how those two things can co-exist. Sure, I think that Chief Justice Roberts, in his opinion in Germany versus Philip, explained this in ways that I find helpful. The act of state doctrine, if this court were to apply the act of state doctrine, and it should not because Congress said it shouldn't, what the court would be doing would be saying, look, we just don't have the competence to determine what happened in Cuba and what the validity of those acts in Cuba is. It's a judicial competence doctrine that the Supreme Court created in Sabatino. Well, not just competence, but I assume it's sort of a comedy, right? We're not gonna tell Cubans what their law is. That's right. But the domestic takings rule is a background law of property principle. It's not a question about comedy. It is instead, the law of property says that a purely domestic taking does not violate international law, but a taking by a foreign sovereign of the property of foreign nationals is a violation of international law for which international law provides redress. And moreover, that offends the national security interest of the other sovereign. So a Cuban taking from a US national offends the interest of the United States. And that- Does that stand under the act of state doctrine provision, paragraph six here? Does that give, what's left of paragraph six? What does paragraph six do? Because I'm wondering if that would surplusage if we give the domestic taking doctrine full force. I don't think it does at all, Your Honor, because what that provision tells us is that, I'm gonna loop back to Germany versus Philip, but the act of state doctrine would simply mean that this court cannot and should not say, look, as a matter of comedy, we're just not gonna touch what happened in Cuba. The domestic takings rule provides an interpretive principle regarding the scope of what Congress was legislating. And so it's an extraterritoriality principle. This court in Kiev said, US law governs domestically, but it doesn't govern the world. And so Congress legislating against that principle did not mean to govern against the world. And when Chief Justice Roberts talked about this in the Germany case, the Philip case, he explained that the Hickenlooper Amendment abrogated the act of state doctrine vis-a-vis the Foreign Sovereign Immunities Act, but it did not abrogate the domestic takings rule as to the Foreign Sovereign Immunities Act. I get that. I apologize if I'm just missing the point, some fundamental problem here, but I get how, in theory, the act of state doctrine and the domestic takings doctrines occupy, they're not coextensive. I get that in theory. But the whole point of this particular provision, this particular title, is to essentially not undo the Cuban confiscation, but certainly to disrupt it. We're in conflict with Cuban law in some way. We're putting the United States in conflict as a matter of foreign policy, which is why I presume most presidents don't let this take effect. Given what this law is about, the act of state doctrine, the only purpose of this is to essentially abrogate the domestic takings principle, isn't it? What other force would it have in this statute, not just hypothetically in other contexts? Your Honor, the very clear force of the statute, which would be to provide a cause of action for U.S. nationals whose property was taken by the Cuban government, because that taking, the taking by, for example, Mr. Glenn refers, both parties refer in their briefs to the Havana docks case, which is pending in the Southern District of Florida and now up in the 11th Circuit. Havana docks was a U.S. national at the time, it's a corporate entity, it was a U.S. national at the time of the taking, and it remains a U.S. national today. That U.S. national has a cause of action under Title III of the Helms-Burton Act because it's taking offended international law, and therefore is exactly the kind of taking about which Congress was concerned and for which it created this remedy. But if the court is not, to be clear, if the court is not persuaded or thinks that this Article III inquiry is a, quote, arduous one, then the Supreme Court in Synacam made clear that it can deal instead with a different threshold, non-merits ground, which is the acquisition argument, the statutory standing argument that we have already discussed and that Mr. Bono has also already discussed. If there are no further questions regarding either Article III or the acquisition point, I would like to just briefly address the scienter argument that Mr. Glenn, that Mr. Bono has also addressed here this morning. The statute does, contains a scienter requirement that requires knowing and intentional conduct on the part of American Airlines, of the defendant. Mr. Glenn's principle argument regarding the application of that scienter requirement is that the district court erroneously relied on excitement video, which is a criminal law doctrine, but that is plainly incorrect. First of all, excitement video applies plain English and grammar before it even reaches any lenity type principles. What is more, the Supreme Court in Flores-Figueroa and McFadden and this court in FAYA and other cases have all explained that the application of a scienter requirement to both the transitive verb and the direct object of that transitive verb is a matter of ordinary English. It is not a matter of criminal law lenity or any other criminal law doctrine. And where the knowing and here, the scienter requirement requires not only that American knows that it is using some property, but that it knows that it is using and intends to use confiscated property. I think the analogies that the Supreme Court provided in Flores-Figueroa are on all fours here, as the court explained in that case, if a child knowingly takes his sister's toy, the ordinary English tells us that that means that the child not only knows he's taking a toy, but that he knows he's taking his sister's toy. That explanation by the Supreme Court is fully applicable here. The knowing and intent requirement requires Mr. Glenn plausibly to plead not only that American Airlines knew that it was using property, but that that property had been confiscated. And no such plausible allegations exist in this case. American Airlines did not confiscate this property. It does not run the hotels in question. It did not select which hotels got listed on bookAAhotels.com. It earned a commission of just over $500 on these bookings. And these hotels are no longer listed on the website. There is no plausible allegation that American Airlines knew and intended to traffic in confiscated properties. If there are no other questions, we would respectfully request that the court affirm the district court's dismissal of Mr. Glenn's complaint. Thank you, sir. Thank you. That case will be submitted. And if the panel is ready, we'll take the third case to the oriole today. Doesn't Mr. Bono have some time for a moment? Oh, I'm sorry. Am I missing something? I'm so sorry. I do. I apologize. No problem, Judge Jenison. Thank you, Judge King. Mr. Bono. Thank you. I just want to address quickly two points. First, the domestic takings issue, which obviously was discussed pretty prominently there. I just want to make two points. First, Judge Ho's questions on how active state doctrine and the domestic takings rule can possibly coexist in this statute, I think are directly on point. The Germany and Philippe case that counsel referenced is illustrative of exactly that. There is an amendment in that case that the court discussed where the active state doctrine and the domestic takings rule coexist. That amendment is the Hickenlooper amendment, that Hickenlooper amendment, excuse me, that counsel referenced that was made after the Sabatino decision, wherein the amendment stated that the right to property is asserted if the right to a property is asserted based upon a taking by the active state in violation of the principles of international law, then there's an issue, right? The portion that mattered there is that there was this inclusion of in violation of international law tied to an active state. And then that is why the court then goes on to do the domestic takings analysis. And if you'll follow through this entire opinion, the violation of international law is the key component that the court was tying the domestic takings issue to, because domestic takings is a concept of international law. And if a violation of international law is incorporated, then of course we have to consider it. Here in the Helms-Burton Act, there is no reference to violation of international law in relation to active state. The only thing it says is the active state doctrine doesn't apply, period. Thus, the domestic takings rule is not incorporated into this statute. International law is not incorporated into this statute. And so that argument is entirely irrelevant to the standing analysis under this statute. That's further accented by the findings that we discussed earlier under 6081, where Congress goes through great detail about refugees from Cuba who were Cuban nationals at the time of confiscation coming to the U.S. as refugees, later becoming naturalized citizens. And then Congress goes on to give U.S. nationals, quote, U.S. nationals, this private right of action. The court, unlike the term acquire, U.S. nationals is a defined term in this statute. And the definition of the U.S. national in this statute is any U.S. citizen, not natural born U.S. citizens, not citizens at the time of confiscation, any U.S. citizen, meaning the Cuban refugees that Congress refers to in 6081 that became naturalized after the confiscation, qualify as any U.S. citizen, thus any U.S. national that has a right to a claim here. And so the domestic taking rule just is irrelevant to this analysis. I thought more about Judge Ho's questions earlier about what if this statute uses the word take instead of acquire? Wouldn't that change? Why wouldn't that just like ruin all of your arguments? I think the answer is no. I actually think that the question implies that in your mind, the term acquire does have a more active component. You don't take something passively, right? If the term take was used, I think the same analysis where you look to the policies and objectives of the statute to ensure that victims have a judicial remedy would apply. When someone gives you a gift, you don't say I took the gift, right? If you take a gift, you're generally taking a gift from somebody else that wasn't intended to be yours. You receive a gift, but you don't take a gift. You don't acquire a gift. You receive a gift. You don't acquire an inheritance. You don't take an inheritance. In general common parlance, undoubtedly there are statutes, many of them, where acquired included the term inheritance, but this statute, because of the purpose of the statute, because of what Congress said in 6081, the purpose of the statute would not be satisfied if acquired was interpreted so broadly as to include passive inheritance or passive. This is not a big deal, but I just thought I heard you say at the very outset of this argument that your client did take ownership after 1996. It's just that he didn't acquire it at all. Right, so he took acquired, I guess. My point, I guess, is that whenever the terms are used, I'm considering them as an active, I guess, so maybe I misspoke when I said take. But that's fine. Yeah, so I mean, he inherited his position after 1996. Thank you, Your Honors. Thank you, sir. The case will be submitted.